# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 47749

MCCARTHY CORPORATION, an Idaho corporation,

    Plaintiff-Counterdefendant-Appellant,

v.

STARK INVESTMENT GROUP, LLC, an Idaho limited liability company; CRAIG STARK, a married man;

    Defendants-Counterclaimants-Respondents,

and

U.S. BANK, N.A., a national association,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, May 2021 Term

Opinion filed: June 24, 2021

Melanie Gagnepain, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, Kootenai County. Richard S. Christensen, District Judge.

The judgment of the district court is <u>affirmed</u>.

Lukins & Annis, PS, Coeur d'Alene, for Appellant.

Ramsden, Marfice, Ealy & De Smet, LLP, Coeur d'Alene, for Respondents.

MOELLER, Justice.

Craig Stark entered into a contract with McCarthy Corporation to construct a storage facility for recreational vehicles and boats. The relationship began amicably but quickly turned sour after McCarthy sent Stark an invoice for work Stark believed he had already paid for in full. After the parties were unable to resolve their dispute, Stark terminated McCarthy's contract. McCarthy then filed a lien against Stark's property and brought suit for breach of contract and to

1

foreclose its lien. Stark, Stark Investment Group, and U.S. Bank, Stark's construction lender on the project, counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, slander of title by the recording of an unjust lien, and breach of the Idaho Consumer Protection Act ("ICPA").

After a lengthy bench trial, the district court largely agreed with Stark's counterclaims and dismissed McCarthy's complaint. On the counterclaims, the district court found: (1) McCarthy breached the contract; (2) McCarthy breached the implied covenant of good faith and fair dealing through its erroneous billing practices, by not negotiating the billing dispute in good faith, and by improperly requesting payment upfront for services; and, (3) McCarthy violated the ICPA by engaging in misleading, false, or deceptive practices. The district court awarded damages to Stark under the breach of contract counterclaim and the ICPA violation. It also awarded Stark his reasonable attorney fees. McCarthy appealed the district court's findings, damages award, and attorney fees award.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**Factual Background**

Craig Stark ("Stark") was employed at a nuclear power plant in Texas. As he neared retirement in the summer of 2017, Stark decided to retire to Idaho. Stark had some experience in real estate development, having built six homes, a storage facility in Iowa, and a Recreational Vehicle (RV) park in Texas. In March of 2017, Stark purchased approximately twenty-five acres in Kootenai County, Idaho. Stark planned to construct an RV and boat storage facility (hereinafter "the Project") to provide him with retirement income. Before Stark purchased the property, he met with a civil engineer, Scott McArthur, from h2 Surveying and Engineering ("h2"). Stark employed McArthur and h2 to survey the property, prepare a site disturbance plan, assist with obtaining a conditional use permit (CUP), and prepare the Project's plans and specifications. Stark also contracted with McCarthy Corporation ("McCarthy")—a registered Idaho contractor relatively new to the excavating business—for the site preparation. McArthur introduced Stark to Jason Cheyne, a project manager and heavy equipment operator for McCarthy. Cheyne became McCarthy's project manager on the Project.

Stark acted as his own general contractor. This created challenges because Stark resided in Texas until August of 2017. As a result of the logistical challenges, Stark asked McArthur to monitor the Project in his absence. This request resulted in dual responsibilities for McArthur

2

because he was already acting as the quantities engineer with h2 so that McCarthy could prepare invoices for payment. Yet, at the same time, McArthur became Stark's eyes, ears, and sometimes voice on the Project.

The Project was divided into two "phases." Phase 1 consisted of preparing the land to construct four buildings, an office, fencing, and parking. Phase 2 consisted of constructing five additional storage facilities. The contract between Stark and McCarthy contained a typical "change order" provision, which required any significant changes in the plans to be approved in writing in advance by Stark:

> Change Orders. Contractor agrees to verbal change orders provided the amount does not exceed $1000 in value; the change order amount is emailed to the Owner; and the Owner accepts the change Order amount by email or writing. The parties agree that any change order exceeding $1000 in value shall be signed by Owner and delivered to Contractor.

Prior to entering into the contract, Cheyne dug four test holes on the property for McArthur to analyze and determine whether there was sufficient quantity and quality of earthen materials on-site to be used for the Project's site preparation. The test holes would also be used to calculate an engineer's estimated quantities of stripped waste and other materials necessary to complete Phase 1 of the Project. Cheyne and McCarthy would also use these calculations to prepare McCarthy's bid on the Project. McCarthy's bid on the entire Project entailed 35 individual bid items totaling $413,551.54. Much of the conflict in this case revolves around three specific bid items, enumerated as items 3, 14, and 19:

| Bid Item # | Bid Item Description | Estimated Units | Unit Price | Total Item Price |
|---|---|---|---|---|
| 3 | Stripped Waste Material | 18,878 cubic yds. | $2.50 | $47,195.69 |
| 4 | Import/Suitable/Structural Material (compacted in place) | 15,602 cubic yds. | $4.03 | $62,877.67 |
| 19 | 4" compacted base rock – ¾" crushed/angular rock (placed and compacted) | 2,867 tons | $17.70 | $50,571.50 |

3

The Project plans called for McCarthy to first strip the waste material from the property (Bid item 3), then replace it with fill material (Bid item 4), and finally, cover part of the area with 4 inches of compacted base rock and 3/4 inches of crushed angular rock (Bid item 19). Regarding Bid item 4, it was anticipated that this would be accomplished by McCarthy taking material from an on-site borrow pit to raise the building pad elevations to satisfy the CUP requirements. Bid item 19 was intended to serve as the subbase layer for the asphalt.

The first step of the site preparation called for removing the trees on the property. McCarthy subcontracted with Mendenhall Logging to complete this work, which was completed by the beginning of April 2017. The next step entailed stripping the future building sites of vegetation and topsoil and excavating an on-site borrow pit. The on-site borrow pit would be used to mine materials that would, in turn, be used on the property to raise the building and parking area elevations to meet the CUP requirements. Cheyne subcontracted this work to a Montana excavating company, Basin Industrial Services, Inc., ("Basin"). Basin was not licensed in Idaho.

On May 18, 2017, McCarthy sent Stark Invoice No. 2435 for the work performed on Bid items 3 and 4. The invoice totaled $112,725.77, which closely resembled the original bid amounts. Stark paid it in full on May 22, 2017.

During excavation of the on-site borrow pit, Cheyne and Basin came to the conclusion that there would not be enough fill material generated from the on-site borrow pit to adequately raise the elevations of the building sites and parking areas consistent with the CUP. Cheyne started to import material from a nearby, alternative, off-site pit, known as the "Swartout Pit." Cheyne took this course of action because it was the least expensive option for obtaining material and it would result in less delay than other options.

Cheyne claimed he told McArthur as of May 22, 2017, that he decided to use the Swartout Pit for more fill material. Cheyne believed McArthur to be in agreement with this decision and McArthur had authority from Stark. McArthur asserted otherwise. McArthur testified at trial that he did not agree to, nor did he have knowledge that Cheyne was going to use the Swartout Pit for more fill material. McArthur's understanding was that there was enough material at the on-site borrow pit to complete Phase 1 of the Project, i.e., bring the initial building pad elevations up to CUP requirements. McArthur understood Cheyne's concerns about lack of material at the on-site borrow pit as referring to Phase 2 of the Project. McArthur further

4

testified that he had no knowledge that Cheyne used the Swartout Pit for material until after the fact. Stark was not informed that Cheyne was importing material from the Swartout Pit.

On July 13, 2017, Stark received Invoice No. 2481, which entailed Bid items 19, 25, 30, and 32. Bid item 19 closely resembled McCarthy's original bid: 4 inches of compacted base rock and ¾ inches of crushed angular rock, placed and compacted. McCarthy charged Bid Item 19 as 2,867 tons at $17.70206 per ton, for a total item cost of $50,751.80. Five days later, on July 18, 2017, Stark paid Invoice 2481 in full.

Despite Stark and McArthur not agreeing to import additional fill material from the Swartout Pit, McArthur provided calculations for the volume of earthen material removed from the site, the amount of material the on-site borrow pit provided, and for the volume of material imported from the Swartout Pit. He provided these calculations to McCarthy on July 21, 2017. McArthur calculated that McCarthy stripped 21,475 cubic yards of material from the property, the on-site borrow pit provided 13,353 cubic yards of fill material, and McCarthy imported 3,584 cubic yards of material from the Swartout Pit. McArthur used a 12% material loss calculation due to compaction for both the on-site fill material and the imported fill material. When McArthur explained these calculations to McCarthy in an email, McArthur noted that the 3,584 cubic yards of imported material from the Swartout Pit was the number provided by McCarthy. The calculations revealed the Project used a total of 16,937 cubic yards of fill material.

McCarthy then used McArthur's calculations to generate Invoice No. 2488, which totaled $158,980.00. Stark received Invoice 2488 on July 25, 2017. The invoice included a single line item for 3,584 tons of "4 [inch] compacted base rock (concrete slab)—¾ [inch] crushed/angular rock" at a unit rate of $30.00 for a total cost of $107,520.00. This line item charge concerned Stark. He questioned this amount with Robert McCarthy (hereinafter individually "Robert"), president of McCarthy, as Stark had already paid $65,530.08 for 15,602 cubic yards of import material compacted in place (Bid Item 4) through Invoice No. 2435 and $50,751.80 for 2,867 tons of 4 inch compacted base rock and ¾ inch crushed angular rock (Bid Item 19) through Invoice No. 2481. The new charge seemed identical to Bid item 19, which Stark had already paid in full. Moreover, the unit price was higher than either Bid item 4 or 19 in the original contract.

Stark did not pay Invoice 2488. Stark testified that when he confronted Robert about Invoice 2488, Robert responded by stating, "just pay it now and we'll figure it out later." Stark explained that he did not pay Invoice 2488, because he was required by his lender, U.S. Bank, to

5

only submit accurate invoices for payment. As the district court noted, this "discrepancy in billing became the irritation that became the boil that infected the parties' heretofore positive relationship." McCarthy now concedes Invoice 2488 contained errors.

On August 22, 2017, McCarthy sent Stark Invoice No. 2504, totaling $121,620.55. This invoice included a charge for 6,451.2 tons of "import converted to tons" at a unit rate of $9.00 for a total amount of $58,060.80. At this time, McCarthy also informed Stark that the paving company McCarthy hired as a subcontractor required half of the paving cost—$99,000—upfront, and Stark needed to pay McCarthy for this. The following day, Robert provided Stark with another invoice but renumbered it as "Invoice 2488," in the *increased* amount of $238,986.98. This invoice included a similar "import converted to tons" charge, but also included a "to be completed" charge of $99,000 for the paving company's upfront fee.

After receiving the increased invoice, the notice to pay the paving costs upfront, and the parties' failure to resolve the billing discrepancies, Stark's counsel sent McCarthy a termination letter on August 25, 2017. The letter reasoned that Stark was terminating the contract for McCarthy's material breach of the contract, but the letter did not set forth the nature of the material breach. Despite the termination, McCarthy continued to send Stark revised versions of Invoice 2488. On September 1, 2017, Stark received an invoice for $162,087.56. This invoice included a slight increase for "import converted to tons" in the amount of $58,060.80 and a not-before-seen, one line item charge for "6,554.95" cubic yards of "additional borrow" at a unit price of $4.03 per cubic yard for a total of $26,416.45. On September 11, 2017, Stark received a subsequent invoice in the lesser amount of $145,706.56. It included a slightly lesser charge for "import converted to tons" at $55,000 but the same "additional borrow" charge of $26,416.45.

On September 22, 2017, Stark sent McCarthy a payment of $49,399.99 with the condition that McCarthy execute an unconditional lien release for all labor, material, and services rendered through September 22, 2017. Stark also included a detailed letter that explained why he believed he owed McCarthy only $49,399.99 from the latest invoice of $145,706.56. Stark agreed to pay McCarthy for the additional 3,200 cubic yards of fill material it imported from the Swartout Pit, at the contract rate used for other fill material. McCarthy rejected the payment and conditions. On this same day, McCarthy filed a Claim of Lien on Stark's property for $145,706.56 with the Kootenai County Recorder as Instrument No.

6

2612854000. On October 5, 2017, Stark sent McCarthy an identical payment of $49,399.99, but without conditions. McCarthy accepted the payment.

On October 23, 2017, Stark received another invoice in the increased amount of $176,691.71. The "import converted to tons" charge increased from 6,451.2 tons to 8,780.4 tons with an increased unit rate of $10.95 per ton for a total charge of $96,145.38. The amount of "additional borrow" in this invoice increased from 6,554.95 cubic yards to 17,612 cubic yards for a total charge of $70,976.36. This invoice was practically identical to the last invoice, except for the increase in "import converted to tons" and "additional borrow." The total invoice calculated at $226,031.70 but stated the amount due was $176,691.71; presumably because it applied Stark's final $49,399.99 payment generally instead of specifically to certain line items, as stated in Stark's letter. McCarthy had not performed any additional work or provided any additional materials since its termination on August 25, 2017. Stark did not make another payment.

After the dispute began between Stark and McCarthy, Robert took over direction of the subsequent invoices, including the multiple renditions of Invoice 2488 and Invoice 2504. The following is a summary of the invoices McCarthy sent to Stark:

| Invoice Number | Invoice Date/Date Received | Invoice Amount |
| --- | --- | --- |
| 2488 | 07/25/2017 | $158,980.00 |
| 2504 | 08/22/2017 | $121,620.55 |
| 2488 | 08/23/2017 | $238,986.98 |
| 2488 | 09/01/2017 | $162,087.56 |
| 2488 | 09/11/2017 | $145,706.56 |
| 2488 | 10/23/2017 | $176,691.71 |

To complete the Project, Stark contracted with Waldo Construction, Inc., and other subcontractors. Due to McCarthy's lien on the property, Stark was required by U.S. Bank to extend his construction loan at least three times.

**Procedural History**

McCarthy brought suit against Stark, Stark Investment Group, LLC, and U.S. Bank, seeking to (1) foreclose the lien it placed against Stark's property and (2) seek damages for breach of contract. McCarthy also requested attorney fees pursuant to Idaho Code section 12-

120(3). Stark answered McCarthy's complaint and counterclaimed for breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, slander of title and recordation of unjust lien claim, and breach of the Idaho Consumer Protection Act (ICPA). Stark requested attorney fees under Idaho Code section 12-120(3), and under Idaho Code section 48-608(1) of the ICPA. Before trial, Stark voluntarily dismissed his counterclaim for fraudulent misrepresentation. The case proceeded to a seven-day bench trial.

Following trial, the district court determined that McCarthy (1) breached the contract by failing to obtain a written and signed change order for importing materials from the Swartout Pit, and (2) breached the covenant of good faith and fair dealing through McCarthy's billing practices and demand for the paving costs upfront. The district court found that McCarthy failed to present a written change order at trial and that McCarthy did not meet its burden to show that McArthur had knowledge of the use of materials from the Swartout Pit so that he could waive the change order provision. "The only fact that is clear to the [district] [c]ourt is that there was no change order approved, or even requested, as to the import and use of the materials from the Swartout Pit." Furthermore, the district court determined that McCarthy breached the implied covenant of good faith and fair dealing in three ways: (1) over-billing through its multiple invoices; (2) Robert's "cavalier" comment to Stark to "just pay the invoice and work it out later"; and (3) McCarthy's demand for payment for paving services upfront when the work had not started, the paving contractor did not require payment upfront, and the contract only required payment for services actually performed.

The district court granted some of the breach of contract damages requested by Stark. The district court found that Stark had met his burden by showing that completion of the Project cost an additional $202,090.81. By terminating McCarthy's employment, Stark avoided paying $150,329.98 to McCarthy to complete the Project. Therefore, the district court concluded that because the Project was completed at an additional $51,760.83, Stark was entitled to a judgment in that amount.

Next, the district court addressed McCarthy's claim to foreclose its lien on Stark's property. The district court noted that "the lien claimant bears the burden of presenting substantial and competent evidence that the claimed labor and materials which are the subject of the lien were actually incorporated into the land which is subjected to the lien." The district court concluded that McCarthy did not meet this burden by (1) failing to reconcile Invoice 2488 or the

8

four subsequent revised invoices, (2) not supporting or explaining the original lien amount, and (3) failing to account for the increased amended lien amount after Stark made a payment of almost $50,000. Although much of the trial testimony was in conflict, the district court stated: "When comparing the testimony of Stark to the testimony of Rob McCarthy, the [district court] finds the former to be more credible and convincing than the latter." Accordingly, the district court ordered McCarthy's amended lien be "removed."

Turning to Stark's remaining counterclaims, the district court denied Stark's counterclaim for slander of title. The district court concluded that Stark's action for slander of title could only succeed if Stark proved that McCarthy had no basis for the *entire* amount of its lien claim; it was not enough to show the lien claim was partially inaccurate. Although Stark was successful in defending against McCarthy's lien claim, he did not show the entire amount of the lien claims were filed in bad faith and with a reckless disregard for the truth. The district court concluded that Stark essentially needed to show the lien claim was done with malice as to the entire amount. The district court noted that McCarthy was new to site-preparation work and had never handled anything similar to this Project. "Although it may have been irresponsible for McCarthy to take on the Stark project, its poor decision making; its failure to provide proper invoices; and its customer neglect do not automatically translate into 'malice' for the *entire* sum set forth in the claims of lien." (Emphasis in original).

Finally, the district court addressed Stark's counterclaim that McCarthy violated the ICPA under Idaho Code section 48-603(17). The ICPA prohibits unfair methods and practices, including "engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer." I.C. § 48-603(17). Stark alleged McCarthy's false invoices, dishonest demand for money upfront for paving work, and "bullying" of McArthur fall within the prohibited conduct of the statute. The district court agreed with Stark only on the first two allegations.

> As was shown by the numerous Invoice(s) No. 2488, McCarthy was billing for items it didn't properly quantify and was attempting by the same course of action to bill for what Stark had already paid for. Compounding the deceit was Rob McCarthy's response and attitude of "just pay the bill and we'll work it out later," when confronted by Stark about the overbilling.

Regarding McCarthy's request to Stark to pay for the paving work upfront, McCarthy threatened to hold up the Project unless Invoice 2488 was paid. Stark refused to pay Invoice 2488 because of legitimate concerns that went unaddressed by McCarthy. Instead, McCarthy then concocted a

9

rouse that the paving company was requiring 50% upfront costs for the asphalt and that Stark needed to pay for that. However, at trial, McCarthy presented no independent or corroborating evidence that the asphalt company asked for a 50% down payment. The district court found McCarthy's actions to be a misleading or deceptive act, likely to entice Stark to pay McCarthy more money.

The ICPA allows a person to recover ascertainable losses as damages due to an unlawful practice. I.C. § 48-608(1). Here, the district court reasoned that McCarthy's unfair billing practices led to Stark's ascertainable losses. The wrongful billing by McCarthy, and its unwillingness to correct it, coupled with the misleading directive to Stark to pay for the paving services upfront, led to Stark's termination of McCarthy. The district court found that with the billing issues unresolved, McCarthy placed a lien on Stark's property and filed a lien foreclosure suit against Stark and U.S. Bank. McCarthy's action required Stark to defend U.S. Bank in this matter, which caused it to incur additional construction loan costs, and additional inspection fees. Furthermore, due to McCarthy's lien, U.S. Bank required Stark to place $265,037.55 as collateral, into a non-interest bearing account with U.S. Bank from November 10, 2017, through trial.

At trial, Stark presented evidence that the costs to indemnify and defend U.S. Bank were $4,646.70. The additional construction loan costs were $2,050.00 and the two inspection fees totaled $900.00. Gavin Mobraten, a banker at U.S. Bank, testified at trial that the requirement of Stark to deposit money into a collateral non-interest account, the indemnity and defense costs, extra loan costs, and inspection fees could have been avoided but for McCarthy's lien. Mobraten also testified that if Stark had put $265,000.00 into an investment account in 2017, instead of the non-interest account required by U.S. Bank, he could have reasonably expected an interest return rate of 5-7%. The district court accepted Stark's evidence on the defense and indemnification costs, the extra construction loan costs, and the inspection fees as ascertainable damages under the ICPA. The district court also found Mobraten's testimony persuasive but used the lower 5% return to calculate Stark's missed interest opportunity because of the collateral non-interest account requirement. The district court calculated that Stark missed the opportunity to earn $26,503.76 in interest because of McCarthy's lien. Therefore, the district court awarded Stark a total of $34,100.46 in damages under the ICPA.

10

Stark timely requested attorney fees. McCarthy opposed his request. Initially, the district court denied Stark's request in part because it requested attorney fees on work performed on behalf of U.S. Bank and Stark Investment Group, LLC. The district court reasoned that there was no contract or commercial transaction between McCarthy and U.S. Bank or Stark Investment Group, LLC. Therefore, the district court allowed Stark to resubmit a cost bill for just Stark's attorney fees and costs.

Stark timely filed an amended memorandum of costs and attorney fees. The district court then awarded attorney fees under Idaho Code section 12-120(3) and Idaho Code section 48-608(5). First, the district court determined Stark was entitled to attorney fees under Idaho Code section 12-120(3) because the case was a civil action to recover on a contract relating to the purchase or sale of goods and professional services. The contract was a commercial transaction not for household or personal purposes. Stark was also entitled to attorney fees under the ICPA because of his successful counterclaim. The district court awarded Stark $129,434.00 in attorney fees and $4,535.33 in costs.

McCarthy timely filed a notice of appeal, assigning error to the district court as follows: (1) its conclusion that McCarthy failed to demonstrate it is owed any money by Stark to foreclose its lien; (2) its finding that McCarthy breached the parties' contract; (3) its finding that McCarthy violated the ICPA; (4) its decision to award Stark damages under the ICPA; and, (5) its decision to award Stark attorney fees.

## II. STANDARD OF REVIEW

The applicable standard of review regarding a trial court's factual findings and legal conclusions after a bench trial was explained in *Caldwell Land and Cattle, LLC v. Johnson Thermal Systems, Inc.*:

> Review of a trial court's conclusions following a bench trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law. *Borah v. McCandles*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009) (citing *Benninger v. Derifield*, 142 Idaho 486, 488-89, 129 P.3d 1235, 1237-38 (2006)). This Court will not set aside a trial court's findings of fact unless the findings are clearly erroneous. *Id.* Clear error will not be deemed to exist if the findings are supported by substantial and competent, though conflicting, evidence. *Mortensen v. Berian*, 163 Idaho 47, 50, 408 P.3d 45, 48 (2017) (quoting *Pandrea v. Barrett*, 160 Idaho 165, 171, 369 P.3d 943, 949 (2016)). Substantial and competent evidence exists [i]f there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal. . . . *Id.*

11

165 Idaho 787, 795, 452 P.3d 809, 817 (2019) (internal quotations omitted).

" 'An award of attorney fees and costs is within the discretion of the trial court and subject to an abuse of discretion standard of review.' " *Nye v. Katsilometes*, 165 Idaho 455, 459, 447 P.3d 903 907 (2019) (quoting *Ballard v. Kerr*, 160 Idaho 674, 716, 378 P.3d 464, 506 (2016)). When this Court reviews a trial court's discretionary decision, it applies a four-prong test to determine whether there was an abuse of discretion: whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choice available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018).

### III. ANALYSIS

**A. The district court's finding that McCarthy failed to establish that it was owed money by Stark for labor, materials, and services on the Project is supported by substantial and competent evidence.**

McCarthy asserts that it is owed $105,715.35[1]—$96,145.38 for import material and $9,570.00 for six specific items: (1) $500 for storm pipes; (2) $4,750.00 for dry utility trenching; (3) $2,500 for the final mobilization payment; (4) $1,000 for compaction testing; (5) $330 for compacted base rock; and, (6) $500 for a septic permit and test holes. McCarthy contends that the district court erred by concluding that McCarthy failed to show it was owed money by Stark for labor, materials, and services performed in order to foreclose its lien. We affirm the district court's finding that McCarthy failed to meet its burden.

" 'The right of a materialman to assert a lien against a structure for which materials have been furnished is a right granted and therefore determined by statute.' In Idaho, the right exists in I.C. §§ 45-501 and 505." *Sims v. ACI Northwest, Inc.*, 157 Idaho 906, 342 P.3d 618, 621 (2014) (quoting *BMC W. Corp. v. Horkley*, 144 Idaho 890, 893, 174 P.3d 399, 402 (2007)). The purpose of the lien statute is to "compensate persons who perform labor upon or furnish materials to be used in the construction alteration or repair of a building or structure." *Pierson v. Sewell*, 97 Idaho 38, 41, 539 P.2d 590, 593 (1975). A lien claimant bears the burden to present substantial and competent evidence that "the labor or materials were incorporated into the land or building

---

[1] At trial, McCarthy partially abandoned its lien claim in the amount of $70,750.35—the "additional borrow" charge in McCarthy's latest invoice, leaving a requested amount of $105,750.35.

that is the subject of the claim." *Elec. Wholesale Supply Co. v. Neilson*, 136 Idaho 814, 821-22, 41 P.3d 242, 249-50 (2001).

First, McCarthy claims that it is owed $96,145.38 for import material it hauled to the Project from the Swartout Pit, as noted in Exhibit W.[2] In its briefing, McCarthy maintains that it presented substantial and competent evidence that it was owed money for the imported material. It directs this Court to evidence in the record—but the evidentiary support it provided fails to meet that burden. McCarthy cited to exhibits W, 111, 113, 121, and 124. Exhibit W is McCarthy's final invoice to Stark; Exhibit 111 is Stark's detailed letter to McCarthy explaining specifically how much he owes McCarthy; Exhibit 113 is McCarthy's first lien recorded on Stark's property; Exhibit 121 is a map for "dry utility trenching" that contains some "borrow fill" numbers; and, Exhibit 124 does not exist in the record. Looking at Exhibit W, the ninth row down reads "import converted to tons" at 8,780.4 tons. Robert testified that he and Cheyne calculated that amount by counting the number of truckloads from the Swartout Pit to the Project site (271) multiplied by the number of tons of material per truckload (18) multiplied by a 1.8 tons per cubic yard conversion factor to reach the final number (271 x 18 x 1.8 = 8,780.4). Robert testified the hauling rate was $10.95 per ton, which resulted in the charge of $96,145.38 for the import material from the Swartout Pit (8,780.4 x $10.95 = $96,145.38). Although a ticket or invoice has been provided for each truckload, they were not admitted as evidence into the record. The additional alleged support McCarthy cites from the record does not pertain to any of the other items it claims it is owed. As the district court found, McCarthy was similarly unclear on demonstrating what it was owed below:

> Throughout his testimony Rob McCarthy did less to clarify what was owed and why, and more to confound the issue for the trier of fact. When comparing the testimony of Stark to the testimony of Rob McCarthy, the [district court] finds the former to be more credible and convincing than the latter. This is especially so when considering Stark's testimony as to the line by line items in Exhibit T and T-1. Therefore, the [district court] finds that McCarthy has not met its burden of proof of presenting substantial and competent evidence that it was owed any further sums by Stark.

On the other hand, the district court's finding that Stark demonstrated it paid for everything it owed is supported by the record. For example, Stark points to Exhibit 111, which is a detailed

---

[2] It is worth noting that this was a constantly moving target: at one time McCarthy billed Stark $55,000.67 for imported material on August 23, 2017. This figure changed to $58,060.80 on September 1, 2017. It changed again to a flat $55,000 with the following invoice on September 11, 2017. On McCarthy's final invoice, it billed Stark $96,145.38 for import material.

letter he caused to be sent to McCarthy that explained exactly how much Stark owed McCarthy and why. Stark explained the factual basis for this letter in detail during his trial testimony.

McArthur calculated the earthen material removed from the property to total 21,475 cubic yards based on a topographic survey. McArthur also calculated that the on-site borrow provided 13,353 cubic yards of fill material, taking into consideration a 12% material loss due to compaction. Finally, even though it was not approved, McArthur factored in Cheyne's report of 3,584 cubic yards of material imported from the Swartout Pit, also taking into consideration a 12% material loss due to compaction. McArthur added the on-site borrow number (13,353 cubic yards) and the imported material number (3,584 cubic yards) to arrive at a total of 16,937 cubic yards of fill material.

Due to continuing conflict between McCarthy and Stark, with Stark's permission Basin hired a surveyor to survey the property to determine fill material amount used. Basin conducted the survey three months after it completed its work and provided the results. The survey showed that 20,037 cubic yards of material had been placed to fill the area for building pads, using a 1.2 percent fill compaction factor. Taking out the fill factor, the surveyor arrived at 16,697 cubic yards of fill material.

Even though Stark already paid for 15,602 cubic yards of fill material through Invoice 2435, Stark paid McCarthy for the additional 3,200 cubic yards of fill material it imported from the Swartout Pit at the contracted rate. McArthur's calculations and Basin's surveyor's calculations arrive at a similar number, showing McCarthy imported 3,200 cubic yards of import material, using the contract rate for fill material of $4.03 per cubic yard. Therefore, Stark agreed to pay an additional $12,896.00 for the imported fill material, as part of its final payment of $49,399.99. This means that Stark paid McCarthy for 18,802 cubic yards of fill material even though two surveys showed less than 17,000 cubic yards of fill material was used.

Furthermore, Stark went through each of the six specific items McCarthy claims it is still owed. First, McCarthy does not explain where it billed Stark $500.00 for 6" SDR storm pipe. However, on exhibit V line item 5, McCarthy billed Stark $500.00 for work performed under "piping/drainage." This item was not disputed by Stark and covered by his final payment of $49,399.99. Second, Stark demonstrated that it does not owe McCarthy $4,740 for dry utility trenching because it had already paid for that on Invoice 2481. Indeed, Invoice 2481 shows Stark paid $3,900 for "dry utility trenching." Third, Stark explained that it did not pay McCarthy the

14

final mobilization payment because McCarthy was terminated before the job was finished. The mobilization bid item was intended to defray the initial start-up and overhead costs associated with moving materials and equipment to the job site. The contract between Stark and McCarthy stated that Stark would pay $5,000 down, $2,500 at 50% Project completion, and the final $2,500 at 100% Project completion. Because the job was not completed, Stark did not pay the final $2,500 mobilization payment. In its post-trial brief, McCarthy alleged that it was owed the final $2,500 payment for mobilization because McCarthy "had fully mobilized on the project site and thus fully earned this fee." However, it is clear the Project was not completed, as Stark had to hire Waldo Construction, Inc., to finish the Project.

Next, Stark explained that he did not owe McCarthy an additional $1,000 for compaction testing because compaction testing was only two-thirds complete. Therefore, because Stark had already paid McCarthy $2,000 for compaction testing, he owed nothing further. Finally, Stark asserted that Cheyne and McCarthy represented that they would not charge for septic test holes. Because no change order was submitted, Stark only paid for the septic permit fee of $500 and not the test holes charge of $1,000.

In sum, we find that the record supports the district court's conclusion that McCarthy fell short of its burden to demonstrate it was owed any money by Stark. On the other hand, Stark demonstrated that it did not owe McCarthy any money because in its final $49,399.99 payment to McCarthy, Stark paid for all fill material, including fill material from the Swartout Pit, storm pipes, the appropriate mobilization and compaction testing amount, and for the septic permit fee. Stark also showed that he had already paid McCarthy for trenching and, thus, owed it nothing further. Therefore, we affirm the district court's conclusion that McCarthy failed to meet its burden that it was owed any monies. Accordingly, we also affirm its decision not to foreclose McCarthy's lien on Stark's property.

**B. Substantial and competent evidence supports the district court's finding that McCarthy breached the parties' contract by not obtaining a change order for the additional fill.**

McCarthy contends the district court erred by finding that McCarthy breached the parties' agreement by failing to obtain a change order for the additional fill. To sustain a cause of action for breach of contract, one must show: (1) "the existence of the contract," (2) "the breach of the contract," (3) "the breach caused damages," and, (4) "the amount of those damages." *Mossell Equities, LLC v. Berryhill & Co.*, 154 Idaho 269, 278, 297 P.3d 232, 241 (2013). McCarthy only contends it did not breach the contract, it does not contest the other elements of a breach of

15

contract claim: that there was a contract, Stark's calculation of damages, or the amount of the district court's awarded damages. McCarthy argues that Stark waived the change order provision in the contract personally and through his agent McArthur so that McCarthy did not need a written change order to import fill material from the Swartout Pit.

We begin by recognizing the well-known legal standard for modifying a written contract:

> The rule is well recognized that the provision in a private building or construction contract that alterations or extras must be ordered in writing can be avoided by the parties to the contract where their words, acts or conduct amount to a waiver, modification, rescission or abandonment of that provision or where the owner by his acts or conduct is estopped to rely on it.

*Obray v. Mitchell* 98 Idaho 533, 536, 567 P.2d 1284, 1287 (1977) (quoting *Harrington v. McCarthy*, 91 Idaho 307, 310, 420 P.2d 790, 793 (1966)). "[E]xpress terms of written contracts may be later modified by terms implied in fact through the conduct of the parties." *Jones v. Micron Tech., Inc.,* 129 Idaho 241, 245, 923 P.2d 486, 490 (Ct. App. 1996) (citing *Harrington*, 91 Idaho at 310, 420 P.2d at 793).

The evidence presented at trial was conflicting. McCarthy presented evidence that on May 19, 2017, Cheyne called McArthur to inform him they were running out of material at the on-site borrow pit. McArthur did not answer the phone so Cheyne immediately sent a text message. Cheyne's text message read, "We are running way over the 15,000 yards at Starks … There isn't close to enough borrow to fill *the other end*." (Emphasis added). McArthur then called Cheyne. Cheyne and McArthur discussed possible solutions to the problem: Cheyne suggested (1) lowering the building pad elevations, (2) taking material from another on-site borrow pit, or (3) importing material. McArthur told Cheyne that he would get back to him with an answer after he discussed the situation with Stark. McArthur noted that lowering the building elevations was not an option because it would violate the CUP. Also, McArthur was reluctant to open a second on-site borrow pit.  Cheyne testified that "[w]e ended the conversation with [sic] he would get back to me, but it sounded like importing material was the best option."

Stark testified that the next day McArthur sent Cheyne a text message, "From Craig: 10-4 was hoping we may miss the rain. As long as there is enough phase-2 rock area to give us a good layout for steel delivery we should be fine." Then, on May 22, 2017, Cheyne sent Stark a text message that read, "We should be mass graded by Thursday *importing rock* on Friday ready for electricians by Friday of next week." (Emphasis added). Cheyne also sent a text message that

16

stated he was eager to start "hauling material." Cheyne sent an email to Stark and McArthur on June 1, 2017, that stated "we will *import material* threw [sic] the weekend. . . ." (Emphasis added). McCarthy argues that this evidence shows Stark and McArthur knew Cheyne's plan was to import material from the Swartout Pit, Stark agreed to it, and, if not, his agent McArthur agreed to it. In the alternative, McCarthy suggests Stark and McArthur should have known from Cheyne's text messages and email that McCarthy was importing material and neither raised any objection with Cheyne.

On the other hand, McArthur testified that he, Stark, and Cheyne initially estimated there was enough material at the on-site borrow pit to satisfy phase 1 and phase 2 of the Project. Stark testified that he believed Cheyne's text messages about "importing material" to be in reference to hauling in 3/4 inch crushed angular rock (Bid item 19). McArthur believed Cheyne's notification that there was not enough fill for "the other end" was in reference to phase 2 of the Project. Consistent with this theory, after Cheyne notified McArthur of the lack of fill material at the on-site borrow pit, McArthur sent a text message to Stark: "Last night [Cheyne] said he was concerned after we staked the buildings that he might not have as much material to build *phase 2* as he thought. . . ." (Emphasis added). Stark's response back to McArthur is the text McArthur forwarded to Cheyne, mentioned above, that referenced phase 2. McArthur testified that he would have expected Cheyne to contact him if there was not enough fill for phase 1. He never recalled Cheyne reaching out to inform him there would not be enough fill material at the on-site borrow pit to complete phase 1. McArthur believed the property was large enough to open a second on-site borrow pit, rather than import material. McArthur testified that he did not learn that Cheyne and McCarthy imported fill material from the Swartout Pit until after-the-fact. Stark echoed this sentiment and testified that he did not know Cheyne was importing material from the off-site Swartout Pit, stating, "[t]hey never asked permission for that."

We conclude that McCarthy has not met its burden on appeal by showing that the district court's findings were not supported by substantial evidence. Even though some of the evidence presented below is conflicting, this Court does not disturb a district court's findings unless they are clearly erroneous. *Mortensen*, 163 Idaho at 50, 408 P.3d at 48. When the district court considered the conflicting evidence, it found: "[t]he only fact that is clear to the Court is that there was no change order approved, or even requested, as to the import and use of the materials from the Swartout Pit." This finding has not been undercut by anything McCarthy has presented

on appeal. McCarthy has neither shown that there was a change order signed by Stark or McArthur, nor that McArthur and Stark waived the change order provision through their actions. Clearly, the parties were not on the same page: Cheyne intended to import material while McArthur and Stark believed there was enough material to complete phase 1 of the Project. Even if McArthur acted as an agent for Stark, McCarthy did not point to specific evidence presented at trial showing Cheyne and McArthur were on the same page about importing material and McArthur agreed to it. Even Cheyne's testimony conceded that after speaking with McArthur, there was no final decision until McArthur spoke to Stark. Cheyne's text messages to Stark that reference importing material were not specific enough to put Stark on notice that McCarthy was importing fill material. In sum, without a written change order, or a clear action waiving the change order provision, the district court's findings are supported by competent and substantial evidence. Accordingly, we affirm its conclusion that McCarthy breached the contract by not obtaining a change order provision before importing material from the Swartout Pit.

In light of our ruling, we need not address whether McCarthy also breached the parties' contract by violating the implied covenant of good faith and fair dealing. This is because McCarthy did not appeal the district court's award of damages for breach of contract. Therefore, it is irrelevant whether McCarthy further breached the contract under the implied covenant of good faith and fair dealing because Stark was not awarded additional damages for Stark's counterclaim for breach of the implied covenant of good faith and fair dealing.

**C. The district court's finding that McCarthy breached the Idaho Consumer Protection Act is supported by substantial and competent evidence.**

McCarthy contends the district court erred by finding that it engaged in conduct that violated the ICPA. The ICPA's purpose is "to protect both consumers and businesses against unfair methods of competition and unfair and deceptive practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." I.C. § 48-601. It achieves this purpose by declaring any acts or practice that are misleading, false, or deceptive as unlawful. I.C. § 48-603(17).

> The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful
> . . . .
> (17) Engaging in any act or practice that is otherwise misleading, false, or deceptive to the consumer.

18

I.C. § 48-603(17).

First, McCarthy argues that the error in the initial Invoice 2488 was unintentional because once the error was realized, it was corrected. McCarthy's first argument mischaracterizes the findings of the district court. McCarthy's initial Invoice 2488 was not the sole basis for finding McCarthy violated the ICPA. As shown above, McCarthy continued to submit invoices to Stark for payment and the amount kept changing:

| Invoice Number | Invoice Date/Date Received | Invoice Amount |
| --- | --- | --- |
| 2488 | 07/25/2017 | $158,980.00 |
| 2504 | 08/22/2017 | $121,620.55 |
| 2488 | 08/23/2017 | $238,986.98 |
| 2488 | 09/01/2017 | $162,087.56 |
| 2488 | 09/11/2017 | $145,706.56 |
| 2488 | 10/23/2017 | $176,691.71 |

The district court explicitly found:

> As was shown by the *numerous* Invoice(s) No. 2488, McCarthy was billing for items it didn't properly quantify and was attempting by the same course of action to bill for what Stark had already paid for. Compounding the deceit was Rob McCarthy's response and attitude of "just pay the bill and we'll work it out later," when confronted by Stark about the overbilling.

(Emphasis added).

This clarifies that it was not merely McCarthy's initial error on Invoice 2488 that supported the district court's finding, but it was the fact that McCarthy continued to erroneously bill Stark for things Stark had already paid for. After the initial version of Invoice 2488 was issued, McCarthy sent four revised invoices of Invoice 2488. Each subsequent invoice was sent without any supporting documentation to explain how McCarthy arrived at the invoiced amount. Each subsequent invoice billed Stark for "import converted to tons" and "additional borrow," charges seemingly related to Bid items 3, 4, and 19. McCarthy failed to explain how Stark owed more money for Bid Items 3, 4, or 19 when Stark paid for those services, in full, through Invoices 2435 and 2481. Moreover, McCarthy's explanation in his appellate briefing about Invoice 2488—"[u]pon discovery, it was corrected in a matter of days"—is another mischaracterization. Clearly, the error was not fixed in a matter of days. McCarthy does not

19

attempt to rebut the evidence that McCarthy's "fix" to the invoicing dispute was Robert's "cavalier" suggestion to Stark to "just pay the bill and we'll work it out later." Moreover, even after receiving payment, McCarthy increased its lien on Stark's property.

Second, McCarthy asserts its request for 50% payment upfront for the asphalt was not misleading; it was merely a request, not a condition of the work to be done. However, McCarthy's email to Stark read, "[w]ould you mind 50% upfront for asphalt? *Asphalt is requesting it*." (Emphasis added). Despite McCarthy's assertion, the second sentence in the email makes it clear that it was a condition in order to get the work done, not a mere favor. Much more troubling is that it was a clear attempt to deflect responsibility from McCarthy and falsely place it on the asphalt provider. Cheyne testified that the paving company *did not* request 50% of the cost upfront. Cheyne further testified that he heard Rob McCarthy say that paving would not get completed "until we get all the other invoices resolved." This, by definition, would make McCarthy's email to Stark a false or misleading statement under the ICPA.

In sum, there is substantial and competent evidence in the record to support the district court's findings that McCarthy violated the ICPA by deceptively billing Stark multiple times for work Stark already paid for, by telling Stark to just pay the invoice and they can work it out later, and by falsely misleading Stark by informing him that the asphalt subcontractor requested 50% of the paving costs upfront. We affirm the district court's determination that McCarthy violated the ICPA.

**D. The district court properly awarded damages under the Idaho Consumer Protection Act because substantial and competent evidence supported its finding that Stark suffered an ascertainable loss.**

McCarthy contends the district court erred by awarding Stark damages for lost interest on the money Stark deposited with U.S. Bank in the non-interest bearing collateral account. McCarthy argues Stark had no intention to invest these funds because he borrowed most of the money from his daughter, and otherwise would not have used the funds to earn interest. McCarthy's argument is made without citation to any authority to support its position.

Idaho Code section 48-608(1) provides that a consumer who suffers ascertainable losses due to an unlawful act or practice is entitled to recover his actual damages. I.C. § 48-608(1). The district court's findings are well-supported. Stark was required by U.S. Bank to place $265,037.55 into a non-interest bearing account with U.S. Bank after McCarthy filed its lien against Stark's property. McCarthy does not contest that the money was actually deposited, or

20

that the account was a non-interest bearing account. Mobraten, the vice president and commercial banking manager with U.S. Bank, testified that this money could have reasonably earned 5 to 7% in interest if invested. McCarthy did not contest this evidence. The district court awarded the conservative end of that range—5%. Because Stark met his burden to prove an ascertainable loss, we affirm the district court's award of damages under the ICPA.

**E. The district court did not abuse its discretion by allowing Stark to submit a new cost bill with segregated fees.**

McCarthy contends the district court erred by awarding Stark's attorney fees. McCarthy argues that Stark failed to segregate the fees from Stark, Stark Investment Group, and U.S. Bank. McCarthy cites *Hackett v. Streeter*, 109 Idaho 261, 264, 706 P.2d 1372, 1375 (Ct. App. 1985) for the proposition that where no effort is made to segregate fees between jointly represented parties, *Hackett* mandates the denial of a request for fees. Instead, the district court allowed Stark to submit a new cost bill. Essentially, McCarthy's argument is narrow—it alleges the district court abused its discretion by allowing Stark to submit a new cost bill with segregated fees. We find *Hackett* distinguishable from this case and find the district court did not abuse its discretion by allowing Stark to submit a revised cost bill with proper segregation of fees.

In *Hackett*, one attorney defended a subdivision developer and a contractor for the alleged negligent construction of a subdivision water system. *Hackett*, 109 Idaho at 262-63, 706 P.2d at 1373-74. After a bench trial, only the contractor, not the subdivision developer, was found liable. *Id.* The plaintiff sought fees against the contractor and the subdivision developer sought fees against the plaintiff. *Id.* at 263, 706 P.2d at 1374. However, the attorney representing the successful subdivision developer and the unsuccessful contractor did not distinguish between the fees incurred by each party in its request against the plaintiff. *Id.* Therefore, the district court denied the fee request altogether. *Id.* On appeal to the Idaho Court of Appeals, the court affirmed. *Id.* at 265, 706 P.2d at 1376.

The Court of Appeals recognized that the attorney representing both the subdivision developer and contractor submitted an affidavit with the fee request that essentially declined to segregate the fees because the parties would be severally and jointly liable if the allegations in plaintiff's complaint were true. *Id.* at 264, 706 P.2d at 1375. Therefore, the district court was left with a difficult decision: either award the entire fee request, requiring plaintiff to pay for the unsuccessful defendant's legal fees, or award no fees altogether. *Id.* The Court of Appeals held

21

that in this difficult situation, where the option to segregate the fees was declined, the district court did not abuse its discretion by denying the attorney fee request altogether. *Id.*

*Hackett* is distinguishable from this case. Here, all defendants—Stark, Stark Investment Group, and U.S. Bank—were successful against McCarthy. However, the district court denied awarding attorney fees for any work performed on behalf of Stark Investment Group or U.S. Bank because they had no contractual relationship with McCarthy. Therefore, it ordered a new cost bill to be submitted with only Stark's attorney fees. Stark obliged this request to segregate the fees between the parties, instead of refusing to segregate fees like the defendants in *Hackett.* Moreover, in a similar case, this Court has held *Hackett* is "not applicable" where jointly represented defendants were successful and their fees were not segregated. *See Taylor v. Riley*, 162 Idaho 692, 403 P.3d 636 (2017). Here, by allowing Stark to cure the issue, and Stark obliging, the district court did not abuse its discretion. Accordingly, we affirm the district court's award of attorney fees.

**F. Stark is entitled to attorney fees on appeal under the contract with McCarthy.**

Stark contends it is entitled to attorney fees on appeal pursuant to the contract between the parties, the ICPA, and Idaho Code section 12-120(3).

The contract between McCarthy and Stark explicitly provides for attorney fees if a party initiates judicial action to interpret the contract. This provision includes an appeal. "If a party initiates an arbitration or judicial action, *including an appeal*, as to the interpretation or enforcement of this agreement, including remedies upon default, the substantial prevailing party shall be entitled to reimbursement of its reasonable fees and costs." (Emphasis added). Stark has prevailed on appeal: he succeeded on his breach of contract claim against McCarthy and successfully defended against McCarthy's claim that Stark waived the change order provision under the contract. Therefore, we award Stark his reasonable attorney fees and costs under the contract because the contract provided for attorney fees and costs to the prevailing party and Stark is the prevailing party on appeal. I.A.R. 40(a) and 41(a); *see also Alsco, Inc. v. Fatty's Bar, LLC*, 166 Idaho 516, 535, 461 P.3d 798, 817 (2020) (Attorney fees on appeal awarded pursuant to contract).

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's holdings that McCarthy breached the contract between the parties and McCarthy violated the ICPA. Further, we affirm the district

court's award of damages to Stark under the ICPA and its award of attorney fees to Stark. Stark is awarded his reasonable attorney fees and costs on appeal.

Chief Justice BEVAN, and Justices BURDICK, BRODY and STEGNER **CONCUR.**